## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

---

|  |  |  |
|---|---|---|
| **CARLOS ACOSTA**, *et al.*, | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **Civil Action No. 06-745 (RCL)** |
| **THE ISLAMIC REPUBLIC** | ) | |
| **OF IRAN,** *et al.*, | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

---

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

This action arises from the assassination of Rabbi Meir Kahane and the shooting of Irving Franklin and U.S. Postal Police Officer Carlos Acosta on November 5, 1990, in New York. Plaintiffs are Carlos Acosta and his wife, Maria Acosta, Irving Franklin (on his own behalf and as administrator of his wife Irma Franklin's estate), and the surviving spouse, mother, children, and sibling of Rabbi Meir Kahane. Rabbi Meir Kahane was killed and Irving Franklin and Carlos Acosta were seriously wounded by El Sayyid Nosair. Nosair was and is a member of Al-Gam'aa Islamiyah (or, the "Islamic Group"), a terrorist organization headed by Sheik Omar Ahmad Ali Abdel Rahman ("Sheik Abdel Rahman"). Plaintiffs allege that the Islamic Republic of Iran ("Iran"), and the Iranian Ministry of Information and Security ("MOIS"), are liable for damages from the shooting because they provided material support and assistance to the Islamic Group. As such, defendants are subject to suit under the recently revised terrorist exception to

the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605A.[1]

This matter is a re-filing of the same claims that previously were the subject matter of *Acosta v. Islamic Republic of Iran*, Civil A. No. 01-2352 (D.D.C.) (Lamberth, J.). While that case was pending, this Court completed an evidentiary hearing on March 31, 2003, and April 1, 2003. At the hearing, this Court heard live testimony and videotaped deposition testimony and admitted into evidence various exhibits. By Order dated April 21, 2006, that case was dismissed without prejudice. On April 24, 2006, plaintiffs filed the Complaint in the instant action, which consists of claims and parties that are identical to those in the original action. On November 8, 2007, this Court permitted plaintiffs to proceed in the instant action by submitting to the Court exhibits and transcripts or videotapes of all prior testimony introduced during the evidentiary hearing held in *Acosta*, Civ. A. No. 01-2352.

On April 22, 2007, defendants were served with the Complaint and other required documents pursuant to 28 U.S.C. § 1608(a)(4). Service is reflected in a June 18, 2007 letter from the United States Department of State to the Clerk of this Court. (*See* Docket Entry # 13.) Plaintiff thereafter sought entry of default on October 12, 2007, based upon defendants' failure to respond or enter an appearance. Default was entered by the Clerk of this Court against defendants on October 15, 2007.

Based on all of the evidence presented at the evidentiary hearing, the Court makes the

---

[1] Plaintiffs initially filed their Complaint pursuant to 28 U.S.C. § 1605(a)(7). That section was replaced by § 1605A on January, 28, 2008, as part of the National Defense Authorization Act for Fiscal Year 2008. Pub. L. No. 110-181, 122 Stat. 3, § 1083. On February 29, 2008, plaintiffs filed a motion to amend the Complaint in order to assert a cause of action under § 1605A. (*See* Pls.' Mot. Am. Compl., Docket Entry # 22.) This Court issued an Order granting plaintiffs' motion to amend on March 7, 2008. (*See* Order, Docket Entry # 23.) The Amended Complaint was filed on March 11, 2008, and service was effected on July 26, 2008.

following findings of fact and conclusions of law and will, consistent with them, enter default judgment in favor of plaintiff and against defendants Iran and MOIS.

## FINDINGS OF FACT

### I.    Generally

(1) Plaintiff Libby Kahane, a U.S. citizen residing in Israel, is the wife of decedent Rabbi Meir Kahane, and brings this action in her own right and as Administratrix of the Estate of Rabbi Meir Kahane. (*See* Hr'g Tr. 71–72, March 31, 2003.)

(2) The decedent, Rabbi Meir Kahane was a non-citizen residing in Israel at the time of the shooting.

(3) Rabbi Norman Kahane, a U.S. citizen residing in Israel, is the brother of decedent Rabbi Meir Kahane and brings this action in his own right and as Executor of the Estate of Sonya Kahane, the decedent's mother. (*See* Am. Compl. ¶ 8; Norman Kahane Dep. 5:12–23, Mar. 6, 2003.)

(4) Sonya Kahane, a naturalized United States citizen residing in Israel, was the mother of decedent Rabbi Meir Kahane. She passed away since the event at issue and is represented by Rabbi Norman Kahane.

(5) Tova Ettinger, Baruch Kahane, and Cipporah Kaplan bring this action in their own right as the children of the decedent, Rabbi Meir Kahane. (*See id.* at ¶¶ 5–6, 9.) All three plaintiffs were born in the United States and are citizens of the United States.

(6) Plaintiff Ethel J. Griffin, the duly appointed Public Administrator of the County of New York appears as the Administratrix of the Estate of Binyamin Kahane, the son of Rabbi Meir Kahane. (*See id.* at ¶ 7.)

(7) Binyamin Kahane was born on October 3, 1966, in the United States, and was at birth and remained until his death, a citizen of the United States. Binyamin Kahane died subsequent to his father's murder but prior to the institution of this lawsuit. (*See* Baruch Kahane Dep. 39:9–10, Mar. 5, 2003.)

(8) Irving Franklin and Irma Franklin were at all times relevant to this matter residents and citizens of the United States. Irving Franklin brings this action in his own right and as Administrator of the Estate of Irma Franklin, his wife. (*See* Am. Compl. ¶ 3.)

(9) Carlos Acosta and Maria Acosta are residents and citizens of the United States who bring this action in their own right. (*See id.* at ¶¶ 1–2.)

(10) Defendant Iran,"is a foreign state and has been designated a state sponsor of terrorism pursuant to section 69(j) of the Export Administration Act of 1979 (50 U.S.C.A. § 2405(j)) continuously since January 19, 1984." *Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 9, ¶ 19 (D.D.C. 1998) (Lamberth, J.).

(11) Defendant MOIS is the Iranian intelligence service, functioning both within and beyond Iranian territory. Acting as an agent of Iran, MOIS performed acts within the scope of its agency, which caused the death of Rabbi Meir Kahane and the wounding of Irving Franklin and Carlos Acosta. Specifically, MOIS acted as a conduit for Iran's provision of support in the form of, *inter alia*, documents, training, and funding to Sheik Abdel Rahman and the Islamic Group.

## II.    The November 5, 1990 Shooting

(12) In the fall of 1990, Rabbi Meir Kahane, an Israeli political figure and a founder of the Jewish Defense League, embarked upon a speaking tour in the United States. At the time, Rabbi Meir Kahane was residing in Jerusalem, Israel. On the evening of November 5, 1990,

Rabbi Meir Kahane gave his lecture at the Marriott Hotel located in New York City.  At the

conclusion of the lecture, he began conducting an informal question-and-answer session.  At that

time, El Sayyid Nosair approached the rabbi, produced a .357 caliber magnum revolver, and fired

two shots, one of which struck Rabbi Kahane in the neck.

(13) Shannon Taylor, a photographer who was present at the lecture, observed and took

pictures of Rabbi Meir Kahane after the shooting.  The pictures and the testimony of Shannon

Taylor establish that Rabbi Kahane was conscious and aware that his wound was fatal as

evidenced by his raising his hand and gesturing with his finger consistent with an effort to signal

the recitation of the Shema, a Jewish prayer particularly symbolic of the belief in one God.  (*See*

Hr'g Tr. 103–04, Mar. 31, 2003; Ex. 6.)

(14) Rabbi Meir Kahane was transported to Bellevue Hospital where he expired from his

wounds.

(15) Irving Franklin attended the November 5, 1990 lecture with his wife.  When the

lecture was over, Franklin waited at the back of the auditorium, near the exit, while his wife

talked with others.  (*See id.* at 15.)  After hearing shots, Franklin saw a man, who was later

identified as El Sayyid Nosair, running towards him.  Franklin attempted to grab Nosair and hold

him.  (*See id.* at 16.)  When Nosair could not break free of Franklin's grip, Nosair shot him in the

leg.  Another photograph taken by Shannon Taylor shows Irving Franklin lying wounded and

bleeding on the floor.  (*See* Ex. 8.)

(16) Irma Franklin, now deceased, ran to the back of the room where she found her

husband lying on the floor in a pool of blood.  She was extremely upset and had to be comforted

by others.  She waited next to her husband until an ambulance arrived and took them to Bellevue

Hospital.  (*See* Hr'g Tr. 16–17.)  Mrs. Franklin is also depicted in Exhibit 8.

(17) Outside the hotel, Nosair encountered plaintiff Carlos Acosta, a uniformed United

States Postal police officer.  (*See id.* at 36.)  Nosair fired his weapon at Acosta, striking him in

his chest and shoulder.  (*See id.* at 36–37, 39.)  Acosta, who was wearing a bulletproof vest,

returned fire hitting Nosair in the neck.  (*See id.* at 37.)  After which, Acosta secured Nosair's

weapon and detained him.  (*See id.*)  Acosta was also taken and admitted to Bellevue Hospital.

A picture taken by Shannon Taylor at the scene of Nosair's arrest, depicts Carlos Acosta standing

near Nosair and his weapon.  (*See* Ex. 7.)

(18)  Maria Acosta was at home when she received a call from her husband explaining

that he has been shot.  The U.S. Postal Police Department sent an officer to her home who drove

her to the hospital where Carlos Acosta was being treated.  (*See* Hr'g Tr. 62.)

(19) On the day of the shooting, plaintiff Libby Kahane and her brother were at a hospital

in Jerusalem looking after their father who was dying.  (*See id.* at 90.)  They received an early

morning phone call from her brother's wife instructing Ms. Kahane to go home.  (*See id.* at

90–91.) Upon arriving at her home, Ms. Kahane's two sons along with a local rabbi were waiting

there and informed her that Rabbi Meir Kahane, her husband, had been shot and was dead.  (*See

id.* at 91.)

(20) Plaintiff Rabbi Norman Kahane, the younger brother of Rabbi Meir Kahane, was

interrupted by his wife at 5:00 a.m. on November 6, 1990, while he was studying at the

synagogue.  (*See* Norman Kahane Dep. 20:7–19, Mar. 6, 2003.)  She had received a phone call

from a family friend informing her that Rabbi Meir Kahane had been shot, followed by another

phone call explaining that he had died.  (*See id.*)  Recognizing that there was no time to mourn his brother's death, Rabbi Norman Kahane immediately began to prepare the eulogy and burial. (*See id.* at 21:9–13.)

(21) Plaintiff Sonya Kahane, now deceased, learned of her eldest son's death when her youngest son, Rabbi Norman Kahane, arrived at her home at 6:00 a.m.  (*See id.* at 25:1–7.)  Even before he shared the tragic news, she immediately knew that something terrible had happened. (*See id.*)

(22) Plaintiff Tova Kahane Ettinger, Rabbi Meir Kahane's eldest child, received a phone call between 5:30 a.m. and 6:00 a.m. from her uncle, Rabbi Norman Kahane who told her only that her father had been shot.  (*See* Tova Kahane Ettinger Dep. 25:8–24, Mar. 6, 2003.)  Upon hanging up with him, she turned on the radio and heard an announcement that her father had been killed.  (*See id.* at 26:2–4.)

(23) Plaintiff Baruch Kahane also received a phone call early that morning from his uncle, Rabbi Norman Kahane who told Baruch Kahane that his father had been shot and killed in New York.  (*See* Baruch Kahane Dep. 30:16–24, Mar. 5, 2003.)

(24)  Plaintiff Cipporah Kahane Kaplan received a phone call at 5:00 a.m., however, she had recently given birth and her husband answered the call.  Not wanting to upset her, he did not tell her immediately what had happened.  (*See* Cipporah Kaplan Dep. 41:8–24, Mar. 5, 2003.) By 6:00 a.m., Tova, Cipporah's older sister, called and explained to Cipporah that their father was shot and had died.  (*See id.* at 42:2–9.)

(25) El Sayyid Nosair was arrested and transported to the Bellevue Hospital prison ward. While there, Nosair told one of his treating physicians that it was his "duty" to kill Kahane, and that he had no choice but to do so. *United States v. Rahman*, 189 F.3d 88, 105 (2d Cir. 1999).

(26) After his arrest, Nosair was indicted and tried first in New York State court, where he was convicted only of weapons offenses. *See id.* at 106 n.3. An investigation which began subsequent to both Nosair's arrest and the first World Trade Center bombing, lead to the indictment and conviction of Nosair along with nine other individuals, including Shiek Abdel Rahman. Nosair and his coconspirators were convicted of "seditious conspiracy and other offenses arising out of a wide-ranging plot to conduct a campaign of urban terrorism." *Id.* at 103. "Among the activities of some or all of the defendants were the rendering of assistance to those who bombed the World Trade Center, planning to bomb bridges and tunnels in New York City, murdering Rabbi Meir Kahane and planning to murder the President of Egypt." *Id.* (internal citation omitted).

## III.    Iranian Sponsorship of the Shooting

(27) Nosair is a member of the Islamic Group, a radical Islamic fundamentalist terrorist group headed by Sheik Abdel Rahman. As head of the organization, Sheik Abdel Rahman issued "*fatwas*" to conduct "*jihad*" against the United States. *See id.* at 124. Proof of this terrorist organization, the role of Rahman and Nosair in the organization, and its responsibility for the assassination of Rabbi Meir Kahane has previously been established. *See id.* at 160 (affirming Nosair's conspiracy conviction upon finding that the government presented sufficient evidence as to his motivations for the murder of Rabbi Meir Kahane and attempted murder of Acosta and Franklin).

8

(28)  Nosair's killing of Rabbi Meir Kahane and shooting of Irving Franklin and Carlos Acosta were found by the jury to have been accomplished with the statutorily required motive—to maintain or increase his position within a racketeering enterprise, here the *jihad* organization.  *Id.*  at 126–27 (finding that Rabbi Meir Kahane's murder was consonant with the purposes of the *jihad* organization and that the murder was in furtherance of Nosair's membership therein).  This organization was "opposed to nations, governments, institutions and individuals that did not share the group's particular radical interpretation of Islamic law," as charged in the indictment.  *Id.* at 126.

(29)  Nosair's notebook found during the search of his apartment showed that "one of the goals of the *jihad* group was to allow 'Muslims to repossess their sacred lands in the hands of the enemies of God,'—a clear reference to Israel." *Id.* at 127.  "Killing Kahane is related to the fulfillment of these goals." *Id.*  Moreover, other members of the Rahman-led *jihad* organization were shown to have been involved in the murder of Rabbi Meir Kahane, and Sheik Abdel Rahman commented that "he would have been honored to issue a *fatwa* regarding the murder." *Id.*

(30)  The *jihad* organization referenced in *Rahman* is the same organization at issue in this case—the Islamic Group.

(31) Walter Patrick Lang is the former Defense Intelligence Officer for the Middle East and South Asia, in terrorism at the Defense Intelligence Agency ("DIA").  (*See* Hr'g Tr. 132, April 1, 2003.)  At the time of his retirement, Lang was the Director of the Defense HUMINT Service (Human Intelligence) responsible for all Department of Defense HUMINT operations worldwide, including the Arab region.  (*See id.*)  Mr. Lang testified on plaintiffs' behalf as an

expert in the area of terrorism, counterterrorism, and the investigation and analysis of terrorist events. (*See id.* at 138.) He provided sworn testimony that defendant Iran, acting through defendant MOIS, provided material support to the Islamic Group, including, *inter alia*, facilities, transportation, weapons, training, and financial support. (*See id.* at 154–62.)

(32) Larry Johnson was formerly the deputy director for special operations, anti-terrorism assistance, training, and transportation security for the Department of State. (*See id.* at 170.) He remained at the State Department from 1989 through 1993. (*See id.* at 169.) Prior to that point, he served in the CIA providing analysis on terrorist threats and international relationships with foreign states which support terrorist organizations. (*See id.*) Mr. Johnson has testified as an expert analyzing terrorism incidents before several Congressional committees, including the Senate Foreign Relations Committee. (*See id.* at 173.) In the instant matter, he was qualified as an expert witness on terrorism, counterterrorism, and the investigation and analysis of terrorist events and incidents. (*See id.* at 173–74.)

(33) Mr. Johnson was a member of the State Department's Office of Counterterrorism at the time of the November 5, 1990 shooting. (*See id.* at 175.) He testified that as early as 1990, the State Department reported information that Iran was providing support to the Islamic Group headed by Sheik Abdel Rahman. (*See id.* at 176.) He also expressed the opinion that Nosair was part of an international Islamic Jihadist conspiracy carried out through the Islamic Group, which at the time of Rabbi Meir Kahane's murder, received direct support from the government of Iran. (*Id.* at 222.)

(34) The conclusions of Mr. Lang and Mr. Johnson that Iran provided material support to Sheik Abdel Rahman and the Islamic Group were based upon publicly available sources

including the State Department's 1992 *Patterns of Global Terrorism*, (*see* Ex. 33), and a number of different public articles reporting Iranian training and financial support of the Islamic Group and Sheik Abdel Rahman during the time period contemporaneous with the killing of Rabbi Meir Kahane. (*See* Exs. 33–36, 38–40.)

## IV.    <u>Injuries of Carlos Acosta</u>

(35) Although Carlos Acosta survived the attack, he was never able to fully resume his duties. Shortly after the shooting, he began having serious health problems. (*See* Hr'g Tr. 44, Mar. 31, 2003.) Within months of his return to duty, he suffered a heart attack. (*See id.* at 46–47.) As a result of all of these events, he retired earlier than he otherwise planned. (*See id.* at 55.) His hospital expenses totaled $50,000 and he lost $57,000 in income as a result of his early retirement. (*See id.*)

(36) Carlos Acosta recalled receiving a package at his home addressed by Nosair from the Attica prison facility. (*See id.* at 49.) Thereafter, he spent years worrying that Nosair—who clearly knew where Acosta lived—would make another attempt at his life. Moreover, Acosta feared that the terrorists might come to his home and attack his wife as well. (*See id.* at 52.)

(37) Maria Acosta suffered emotional distress as a result of the injuries sustained by her husband. She recalled seeing her husband's open bullet wound when she arrived at the hospital. (*See id.* at 63.) She was stricken with concern that he would not survive. (*See id.* at 64.)

(38) Ms. Acosta also feared for her own life, worrying that the terrorists would come to her home. (*See id.* at 66.) Ms. Acosta's worries continued as her husband later testified against Nosair at his criminal trial. She lived in constant fear that the terrorists responsible for her husband's shooting would retaliate against her family and kill them. (*See id.* at 71.)

V.    **Injuries of Irving Franklin**

(39) As a result of his wounds, Irving Franklin was hospitalized for 30 days.  (*See id.* at 18.)  He experienced excruciating pain each time the nurses attended to his open wounds.  (*See id.* at 20.)  His injuries were so severe and his after care needs were so great that he and his wife were unable to return home even after his release from the hospital and resided for a period of time with their daughter and son-in-law.  (*See id.* at 19.)

(40) After being home for a short time, he became weak, and eventually his wife could not wake him.  (*See id.* at 21.)  He was returned to the hospital a second time for additional blood transfusions and other treatment.  (*See id.*)

(41) Franklin continues to experience pain and cramping in his legs.  He cannot walk or sit for extended periods of time without experiencing pain.  (*See id.* at 23, 25.)  He also has health complications from the blood transfusions that prevent him from engaging in certain activities.  (*See id.* at 23.)

(42)  Aside from his physical injuries, Franklin suffered severe emotional pain and mental anguish.  He could not sleep because he kept reviewing the events of the shooting in his mind. Even today, the memories return each morning.  (*See id.* at 21.)

(43)  Franklin's wife—who had been a witness to her husband's shooting—constantly feared that there would be another attack.  (*See id.* at 22.)  She died in 2000 from a heart attack. (*See id.* at 25.)  Franklin believes that the stress of the shooting and his resulting injuries and ultimately caused his wife to suffer the heart attack.

(44) Franklin's medical expenses for his two hospitalizations totaled $65,000.

12

## VI.    Family Members of Decedent Meir Kahane

(45)  Each of Rabbi Kahane's family members suffered severe emotional pain as a result

of the shooting.  Each of them described the enormous loss to their family that resulted from his

death.  Rabbi Kahane's murder and the events that followed were "unnerving" for all of them.

(*See* Baruch Kahane Dep. 39:17.)  They recognize that the head of their family is no longer there.

(*See id.* at 42:8–10; Tova Ettinger Dep. 31:15–17.)  His mother, Sonya Kahane, cried for years

over the loss of her oldest son.  (*See* Cipporah Kaplan Dep. 56:21–22.)  As a result of Rabbi

Kahane's murder, his wife, mother, brother and each of his children have suffered and will

continue to suffer severe mental anguish.

(46)  Plaintiffs submitted a report on the economic loss of Rabbi Kahane compiled by

Richard J. Lurito, Ph.D.  Dr. Lurito considered Rabbi Kahane's various sources of income

including, *inter alia*, the decedent's salary as an executive with Kach International, income as a

newspaper columnist for The Jewish Press, and fees received for speaking engagements in the

United States. (*See* Ex. 3 at 2.)  Dr. Lurito concluded that Rabbi Kahane's family lost between

$2,449,381 and $3,160,798 in net income due to his death.  (*See id.* at 5.)

## CONCLUSIONS OF LAW

## I.    Legal Standard for FSIA Default Judgment

Under the Foreign Sovereign Immunities Act, no judgment by default shall be entered by

a court unless the claimant establishes his claim or right to relief by evidence satisfactory to the

court.  28 U.S.C. § 1608(e); *see also Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 232 (D.C.

Cir. 2003), *cert. denied*, 542 U.S. 915 (2004).  In FSIA default judgment proceedings, plaintiffs

may establish proof by affidavit.  *Campuzano v. Islamic Republic of Iran*, 281 F. Supp. 2d 258,

268 (D.D.C. 2003) (Urbina, J.).  Upon evaluation, the court may accept plaintiffs' uncontroverted

evidence as true.  *Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229, 255 (D.D.C. 2006)

(Lamberth, J.) (citing *Campuzano*, 281 F. Supp. 2d at 268).  This Court accepts the uncontested

evidence and sworn testimony submitted by plaintiffs as true in light of defendants' failure to

object or enter an appearance to contest the matters in this case.

## II.    Jurisdiction

The Foreign Sovereign Immunities Act is the sole basis for jurisdiction over foreign

sovereigns in the United States.  *See Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S.

428, 434 (1989).  The recently enacted National Defense Authorization Act for Fiscal Year 2008

("NDAA"), Pub. L. No. 110-181, 122 Stat. 3, § 1083, revised the terrorism exception to sovereign

immunity by repealing § 1605(a)(7) of Title 28 and replacing it with a separate section, § 1605A.  The

revised "state-sponsored terrorism" exception provides that a foreign sovereign will not be immune to

suit in U.S. courts where:

> money damages are sought against a foreign state for personal injury
> or death that was caused by an act of torture, extrajudicial killing,
> aircraft sabotage, hostage taking, or the provision of material support
> or resources for such an act if such act or provision of material
> support or resources is engaged in by an official, employee, or agent of
> such foreign state while acting within the scope of his or her office,
> employment, or agency.

28 U.S.C. § 1605A.  Most importantly, § 1605A creates a private, federal cause of action against a

foreign state that is or was a state sponsor of terrorism, and provides for economic damages, solatium,

pain and suffering, and punitive damages.  *See* 28 U.S.C. § 1605A(c).  To establish liability against a

foreign sovereign under § 1605A, plaintiffs must show that (1) the foreign sovereign was designated

by the State Department as a "state sponsor of terrorism;" (2) the victim or plaintiff was either U.S.

national, a member of the armed forces, or a federal employee or contractor acting within the scope of

employment at the time the acts took place; and (3) the foreign sovereign engaged in conduct that falls

within the ambit of the statute.  *See id.*

      The first and third requirements are clearly met in the instant case.  As to the first

requirement, defendant Iran has been designated a state sponsor of terrorism continuously since

January 19, 1984, and was so designated at the time of the attack.  *See* 31 C.F.R. § 596.201 (2001);

*Flatow*, 999 F. Supp. 1, 11 (D.D.C. 1998) (Lamberth, J.).  As to the third element, defendant Iran

knowingly provided material support to Sheik Abdel Rahman and the Islamic Group for the

extrajudicial killing associated with the November 5, 1990 shooting.  As such, Iran's support of Sheik

Abdel Rahman and the Islamic Group falls squarely within the ambit of the statute.  Defendant MOIS

is treated as the state of Iran itself rather than its agent, *Roeder*, 333 F.3d at 234, and thus the same

determinations apply to its conduct.

      The second requirement, which addresses the relationship between the victim or plaintiff and

the United States, requires more discussion.  With the exception of Rabbi Meir Kahane, there is no

dispute that all of the plaintiffs in this action were United States nationals at the time of the

extrajudicial killing as each of them are United States citizens.  Rabbi Meir Kahane's status is more

complicated.  He became a United States citizen by virtue of his birth in New York City on August 1,

1932.  After moving to Israel in 1971, he also became an Israeli citizen by operation of that country's

Law of Return.  During that same time, Rabbi Meir Kahane became actively involved in Israeli

politics.  In early 1988, the Israeli Parliament passed a law that forbade its members to maintain dual

citizenship.  On August 16, 1988, and again on September 16, 1988, Rabbi Meir Kahane completed

an Oath of Renunciation which formally renounced his United States citizenship. On October 7,

1988, the U.S. Department of State prepared a Certificate of Loss of Nationality for Rabbi Meir

Kahane. Less than two weeks later, the Israeli Supreme Court barred Rabbi Meir Kahane's party

from running in the November 1988 Israeli election. Rabbi Meir Kahane subsequently attempted to

withdraw his renunciation of U.S. citizenship. When his attempts proved unsuccessful, he applied to

this Court for a temporary restraining order and a preliminary injunction. The late Judge Barrington

Parker determined that as of September 16, 1988, Rabbi Kahane ceased to be a citizen of the United

States because he voluntarily renounced his American citizenship in order to pursue a political career

in Israel. *See Kahane v. Sec'y of State*, 700 F. Supp. 1162 (D.D.C. 1988) (Parker, J.). The D.C.

Circuit summarily affirmed the district court's determination. *See Kahane v. Sec'y of State*, No. 92-

5311, 1993 WL 71724 (D.C. Cir. Mar. 2, 1993).

The term "United States national" as defined in the United States Code includes both U.S.

citizens as well as someone, though not a citizen, who owes permanent allegiance to the United

States. 8 U.S.C. § 1101(a)(22). Plaintiffs argue that even though Rabbi Meir Kahane was no longer a

U.S. citizen, he remained a U.S. national by virtue of his continued allegiance to the United States.

According to plaintiffs, Rabbi Meir Kahane's appeal of the State Department's determination of his

loss of citizenship demonstrates his permanent allegiance to the United States in spite of his formal

renunciation of citizenship. This Court disagrees. While it is true that Rabbi Meir Kahane challenged

his loss of citizenship, he was unsuccessful in convincing the Court that his allegiance remained in

tact and that it should overturn the State Department's decision. Moreover, plaintiffs' arguments run

directly counter to the clear findings of this Court dating back nearly twenty years ago. As stated by

Judge Parker, "Kahane knew or should have known that when he renounced his American

citizenship the result would be the loss of his United States nationality, rights, and privileges."

*Kahane*, 700 F. Supp at 1168. As such, "his personal and conscious choice[] severed his relationship

with the United States government." *Id.* Under these circumstances, this Court cannot conclude that

the Congress intended that a cause of action under § 1605A remain available to those persons who

voluntarily and deliberately renounce American citizenship. Having failed to satisfy the second

requirement under § 1605A, Rabbi Meir Kahane's claims must be dismissed for lack of standing.

The claims brought by Rabbi Meir Kahane's family members in their individual capacities,

however, remain valid. Section 1605A(a)(2)(A)(ii) requires only that either the claimant *or* the victim

be a U.S. national at the time the act of terrorism occurred. *See e.g. Peterson v. Islamic Republic of

Iran*, 515  F. Supp. 2d 25, 41 n.8 (D.D.C. 2007) (Lamberth, J.) (finding that relatives of a victim who

was a U.S. national at the time of attack had standing even though the relatives themselves were not

U.S. nationals). Since each of Rabbi Meir Kahane's relatives in this action were U.S. citizens at the

time of the extrajudicial killing, each of them maintain a valid cause of action under § 1605A.

## III.    Liability

### A.    Vicarious Liability

The basis of defendants' liability is that they provided material support and resources to the

Islamic Group, which through the acts of Nosair, completed the extrajudicial killing giving rise to this

action. One may be liable for the acts of another under theories of vicarious liability, such as

conspiracy, aiding and abetting, and inducement. This Court finds that civil conspiracy provides a

basis of liability for defendants Iran and MOIS and accordingly declines to reach the issue of whether

they might also be liable on the basis of aiding and abetting and/or inducement.

17

The elements of civil conspiracy consist of: (1) an agreement between two or more persons; (2) to participate in an unlawful act, or a lawful act in an unlawful manner; (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement; (4) which overt act was done pursuant to and in furtherance of the common scheme. *See Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983).

As this Court has previously held, "[s]ponsorship of terrorist activities inherently involves a conspiracy to commit terrorist attacks." *Bodoff v. Islamic Republic of Iran*, 424 F. Supp. 2d 74, 84 (D.D.C. 2006) (Lamberth, J.) (quoting *Flatow*, 999 F. Supp. at 27). Here, it has been established by evidence satisfactory to this Court that Iran continuously provided material support in the form of, *inter alia*, funding, training, and safe haven to the Islamic Group so that it may undertake terrorist attacks like the one in this action. The assassination of Rabbi Meir Kahane and the wounding of Irving Franklin and Carlos Acosta were caused by a willful and deliberate act of extrajudicial killing by El Sayyid Nosair who, as a member of the Islamic Group headed by Sheik Abdel Rahman, was acting in furtherance of the terrorist *jihad* goals of each of them and of defendants. Finally, as will be discussed below, the plaintiffs in this action incurred damages resulting from the death and injuries caused by the conspiracy. Accordingly, the elements of civil conspiracy are established between the Islamic Group and defendants Iran and MOIS.

### B.    Wrongful Death

In Count II of the Amended Complaint, plaintiff Libby Kahane, as the personal representative of Rabbi Meir Kahane's estate, asserts a cause of action for wrongful death. Typically, a wrongful death statute is designed to compensate decedent's heirs-at-law for economic losses which result from decedent's premature death. *Flatow*, 999 F. Supp. at 27. A wrongful death claim, however, is

18

unavailable in the instant matter since Libby Kahane's recovery ultimately turns on the decedent's ability to recover. *See Oveissi v. Islamic Republic of Iran*, 498 F. Supp. 2d 268, 278–79 (D.D.C. 2007) (Lamberth, J.) (holding that plaintiff had no right of action for wrongful death claim brought under the state sponsored terrorism exception to the FSIA since decedent was not a U.S. national and therefore would not have been able to recover under the FSIA had he lived). The FSIA's "state-sponsored terrorism" exception expressly requires that either the victim or plaintiff be a U.S. national in order to recover. 28 U.S.C. § 1605A. This Court has already recognized that Rabbi Meir Kahane was no longer a U.S. national at the time of his November 5, 1990 assassination. Thus, even if Rabbi Meir Kahane had survived the shooting, his deliberate renunciation of citizenship would have precluded him from bringing a cause of action under the FSIA. Because "no action could have been brought by the deceased if still alive, no right of action exists," and the Court lacks jurisdiction to entertain plaintiff Libby Kahane's wrongful death claim. *Oveissi*, 498 F. Supp. 2d at 279 (quoting RESTATEMENT (SECOND) OF TORTS § 925 cmt. a (1971)).

### C. Conscious Pain and Suffering

In Count III of the Amended Complaint, plaintiff Libby Kahane, as the personal representative of Rabbi Meir Kahane's estate, asserts a claim for his conscious pain and suffering experienced between the time that he was wounded and the time of his death. As with wrongful death claims, "survival [claims] are dependent upon the rights of the deceased." RESTATEMENT (SECOND) OF TORTS § 925 cmt. a. "Hence, if no action could have been brought by the deceased if still alive, no right of action exists." *Id.* Here, Rabbi Meir Kahane would not have been able to assert a cause of action under the FSIA for conscious pain and suffering because he was not a U.S. national at the time

19

of the shooting. Thus, no such claim may be asserted for the benefit of his estate and plaintiff Libby

Kahane's claim must be denied.

### D.    Assault

According to the Restatement (Second) of Torts, a defendant has committed an assault if "he

acts intending to cause a harmful or offensive contact with [a] person, . . . or an imminent

apprehension of such a contact" and the person is "thereby put in such imminent apprehension."

RESTATEMENT (SECOND) OF TORTS § 21 (1965).

El Sayyid Nosair's production of the .357 caliber magnum revolver at the lecture on

November 5, 1990, was an intentional act that placed others in fear of imminent harm or offensive

contact.  Moreover, when Nosair fired shots first at Rabbi Meir Kahane, then at Irving Franklin, and

ultimately at Carlos Acosta, these acts were done intentionally and induced fear of immediate harm

and danger in many that were present at the scene.  Accordingly, defendants are liable to plaintiffs'

Irving Franklin and Carlos Acosta for assault.

### E.    Battery

According to the Restatement (Second) of Torts, a defendant has committed battery if "he acts

intending to cause a harmful or offensive contact with [a] person," and a "harmful contact with the

person . . . directly or indirectly results."  RESTATEMENT (SECOND) OF TORTS § 13 (1965).

In light of the uncontested evidence presented by plaintiffs, this Court finds that plaintiffs

Irving Franklin and Carlos Acosta have asserted a valid claim of battery.  Defendants, through their

material support of the Islamic Group, clearly had the intent to make harmful and offensive bodily

contact.  In addition, plaintiffs have proved through pictures and testimony, that Irving Franklin and

Carlos Acosta encountered direct physical contact and consequential injuries as a direct result of this

act.  Accordingly, defendants Iran and MOIS are liable for battery under the theory of vicarious liability.[2]

###    F.    Intentional Infliction of Emotional Distress

Section 46 of the Restatement (Second) of Torts provides that "one who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress."  RESTATEMENT (SECOND) OF TORTS § 46 (1965).  Section 46(2) of the Restatement specifically states that only present third parties may recover for an IIED claim.  Plaintiff Irma Franklin was present at the time of the assassination and therefore has standing to recover.

The Caveat to section 46(2) leaves open the possibility of other possible situations where a defendant could be liable for intentional infliction of emotional distress to a third party plaintiff who was not present to witness defendant's conduct.  *Peterson*, 515 F. Supp. 2d at 42.  As this Court has previously found, "a terrorist attack—by its nature—is directed not only at the victims but also at the victims' families."  *Heiser*, 466 F. Supp. 2d at 328 (quoting *Salazar v. Islamic Republic of Iran*, 370 F. Supp. 2d 105, 115 n.12 (D.D.C. 2005) (Bates, J.)).  The evidence in the instant action is consistent with the Court's previous findings as to the impact of terrorist attacks.  Accordingly, plaintiffs Maria Acosta, Sonya Kahane, Cipporah Kaplan, Libby Kahane, Tova Ettinger, Baruch Kahane, Ethel Griffin and Norman Kahane have standing to recover for an IIED claim.

---

[2]  Because Jason Irving Franklin and Carlos Acosta are entitled to recovery for mental anguish and suffering under their battery claim, the Court need not separately consider his intentional infliction of emotional distress claim, which would result in an impermissible double recovery.  *See Peterson v. Islamic Republic of Iran*, 515 F. Supp. 2d 25, 40 n.7 (D.D.C. 2007) (Lamberth, J.)

This Court further concludes that defendants' actions proximately caused the assassination of Rabbi Meir Kahane and the injuries sustained by Carlos Acosta and Irving Franklin, and the subsequent emotional distress experienced their immediate family members.  Each of the plaintiffs have suffered and will continue to suffer severe emotional distress from the loss and/or injuries sustained by their loved ones.

Accordingly, this Court concludes that plaintiffs have "establishe[d] [their] claims or right to relief by evidence satisfactory to the court," and are therefore entitled to the entry of a default judgment against defendants.  28 U.S.C. § 1608(e); *see Roeder*, 333 F.3d at 232.

**IV.    Damages**

The FSIA specifically permits plaintiffs suing under section § 1605A to pursue "economic damages, solatium, pain and suffering and punitive damages."  28 U.S.C. § 1605A(c).  After reviewing the argument presented by plaintiffs, and the law applicable thereto, the Court makes the following conclusions regarding damages.

**A.    Compensatory Damages**

In determining the appropriate amount of compensatory damages, the Court may look to prior decisions awarding damages for pain and suffering, and to those awarding damages for solatium. *Haim v. Islamic Republic of Iran*, 425 F. Supp. 2d 56, 71 (D.D.C. 2006) (Lamberth, J.).  "While intervening changes in law have ruled many cases' reliance on federal common law improper, such findings need not disturb the accuracy of the analogy between solatium and intentional infliction of emotional distress."  *Id.*

### 1.    Pain and Suffering Award for Carlos Acosta and Irving Franklin

Carlos Acosta and Irving Franklin have sought pain and suffering awards associated with their claims for battery.  Damages for a surviving victim are typically determined based upon an assessment of the following factors:  "the severity of the pain immediately following the injury, the length of hospitalization, and the extent of the impairment that will remain with the victim for the rest of his or her life."  *Peterson*, 515 F. Supp. 2d at 52 n.26 (quoting *Blais v. Islamic Republic of Iran*, 459 F. Supp. 2d 40, 59 (D.D.C. 2006) (Lamberth, J.)).  In awarding pain and suffering damages, the Court must take pains to ensure that individuals with similar injuries receive similar awards.  Upon examination of the nature and impact of the injuries involved, the Court finds that plaintiff Carlos Acosta is entitled to $4 million in pain and suffering, in addition to $50,000 for medical expenses and $57,000 for lost wages.  The Court further finds that Irving Franklin is entitled to $4 million in pain and suffering, plus $65,000 for medical expenses.

### 2.    Pain and Suffering Award for Victims' Relatives

This Court has previously looked to the nature of the relationship between the family member and the victim in order to help determine the amount of each award.  *Peterson*, 515 F. Supp. 2d at 51 (citations omitted).  Parents of victims typically receive awards similar in amount to those awarded to children of the victim.  *Blais*, 459 F. Supp. 2d at 60.  Moreover, families of victims who have died are typically awarded greater damages than families of victims who remain alive.  *Id.*  This Court has previously set out a general framework for compensatory awards for family members of victims who were killed as a result of terrorist activity consisting of $8 million to spouses of deceased victims, $5 million to parents and children of deceased victims, and $2.5 million to siblings of deceased victims. *See Peterson*, 515 F. Supp. 2d at 51–52 n.25 (adopting the damages framework set forth in *Heiser*).

23

As to family members of surviving victims of terrorist attacks, this Court has previously awarded pain and suffering awards as follows: $4 million to spouses of surviving victims, $2.5 million to parents and children of surviving victims, and $1.25 million to siblings of surviving victims. *Peterson*, 515 F. Supp. 2d at 52.

Applying the damages framework set forth above as a guideline, this Court awards each plaintiff damages in the following amounts. Plaintiff Libby Kahane is entitled to $8 million to compensate her for emotional distress and loss of consortium caused by the death of her husband. Plaintiff Sonya Kahane, Rabbi Meir Kahane's mother, is entitled to $5 million for her pain and suffering. Each child of Rabbi Meir Kahane, Cipporah Kaplan, Tova Ettinger, Baruch Kahane, and Ethel Griffin as Administrator of Binyamin Kahane's estate, is entitled to $5 million for pain and suffering. Plaintiff Norman Kahane, Rabbi Meir Kahane's brother, is entitled to $2.5 million for his pain and suffering. As to the spouses of the surviving victims of the shooting, this Court will award a slightly lessor amount than in *Peterson* as the injuries here, while serious, are not as severe and permanently debilitating as the majority of injuries sustained by the bombing victims in that case. Thus, plaintiff Maria Acosta is entitled to $3 million for her emotional distress and loss of consortium resulting from the injuries sustained by her husband, Carlos Acosta. Plaintiff Irma Franklin was present at the time of the shooting and thus suffered her own emotional distress in the face of gunfire and as a result of having witnessed her husband's shooting firsthand. Accordingly, Irma Franklin should receive $3.5 million both as spouse of a surviving victim and for her own pain and suffering endured by being present during the shooting.

24

###### B.    Punitive Damages

The Court's final task is to determine whether, and to what extent, punitive damages should be levied against defendants.  Until Congress passed the National Defense Authorization Act for Fiscal Year 2008,  punitive damages were not available against foreign states.  Under the newly enacted 28 U.S.C. § 1605A, punitive damages are now available against foreign state sponsors of terrorism.  *See* 28 U.S.C. § 1605A(c).

According to the Restatement (Second) of Torts, punitive damages are designed "to punish [a defendant] for his outrageous conduct and to deter him and others like him from similar conduct in the future."  RESTATEMENT (SECOND) OF TORTS § 908(1) (1977).  In determining the proper punitive damages award, courts evaluate four factors:  "(1) the character of the defendants' act, (2) the nature and extent of harm to the plaintiffs that the defendants caused or intended to cause, (3) the need for deterrence, and (4) the wealth of the defendants."  *Flatow*, 999 F. Supp. at 32 (citing RESTATEMENT (SECOND) OF TORTS § 908(1)–(2) (1965)).  In cases such as this, the analysis typically results in punitive damages in an amount three times Iran's annual expenditure on terrorism, or $300,000,000. *See, e.g.*, *Bodoff v. Islamic Republic of Iran*, 424 F. Supp. 2d 74, 89 (D.D.C. 2006) (Lamberth, J.); *Stern v. Islamic Republic of Iran*, 271 F. Supp. 2d 286, 301 (D.D.C. 2003) (Lamberth, J.); *Cronin v. Islamic Republic of Iran*, 238 F. Supp. 2d 222, 235–36 (D.D.C. 2002) (Lamberth, J.), *abrogated on other grounds by Cicippio-Puleo v. Islamic Republic of Iran*, 353 F.3d 1024 (D.C. Cir. 2004); *Eisenfeld v. Islamic Republic of Iran*, 172 F. Supp. 2d 1, 9 (D.D.C. 2000) (Lamberth, J.).

In the instant case, this Court recognizes that a shooting incident, while very serious, is less heinous in nature than a bombing.  While both activities clearly produce deadly results, the sheer number of casualties and the extent of the injuries that this Court has seen in cases involving

bombings are more extensive than those involved in the instant case. Regardless of the severity of the act, however, this Court has no doubt that Iran's intention, in supporting terrorist groups such as the one involved here, is to create maximum harm through terrorist acts. Accordingly, only a large punitive damage award will serve as an effective deterrent against future terrorist acts. As to defendants' wealth, this Court has previously adopted expert testimony estimating Iran's annual terrorism expenditures during the relevant time period at approximately $50 to $150 million. *See Peterson v. Islamic Republic of Iran*, 264 F. Supp. 2d 46, 51 (D.D.C. 2003) (Lamberth, J.); *Heiser*, 466 F. Supp. 2d at 262. Taking all of these factors into account, and the precedent of this Court, the Court shall apply the formula of three times defendant Iran's annual expenditure on terrorism to award punitive damages for plaintiffs and against defendants Iran and MOIS, jointly and severally, in the amount of $300,000,000.

If any recovery is made, compensatory damages should be apportioned upon receipt. After compensatory damages are satisfied, any subsequent recovery of punitive damages should be apportioned to plaintiffs according to the percentage of compensatory damages awarded to each plaintiff.

## **CONCLUSION**

This Court takes note of plaintiffs' courage and steadfastness in pursuing this litigation and their efforts to take action to deter more tragic suffering of innocent Americans at the hands of terrorists.  Their efforts are to be commended.

A separate Order and Judgment consistent with these findings shall issue this date.

SO ORDERED.


Signed by Royce C. Lamberth, Chief Judge, on August 26, 2008.